## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DALE SCHNOKE,** | : | **Civil No.  3:23-CV-281** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.     Introduction

In this case, we do not write upon a blank slate. Indeed, the plaintiff in this

social security appeal, Dale Schnoke, previously filed an application for a period of

disability and disability insurance benefits some seven years ago, on June 29, 2017.

Schnoke's application was originally denied and, following a hearing, an

administrative law judge (ALJ) issued an unfavorable decision. In January 2022,

Judge Mehalchick of this Court remanded the decision on the sole issue that the ALJ

failed to consider and evaluate the medical opinion of Schnoke's treating

orthopedist, Dr. Heinle. (Tr. 1391-1408). The ALJ conducted another hearing and

issued a new, partially favorable decision on October 13, 2022. Schnoke now

1

appeals this most recent decision, arguing that the ALJ again failed to adequately consider the opinion of Dr. Heinle.

Thus, the issue in this case is narrow and involves a central tenet of Social Security law, but one that has evolved over time, the Commissioner's decision to eschew the treating physician rule, which created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy, in favor of a more holistic approach which examines all medical opinions in terms of their overall consistency and supportability.

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Importantly in this case, the plaintiff challenges the ALJ's treatment of a treating source opinion that is, itself, inadequately defined and supported. Indeed, the opinion provides no detail about the specific limiting effects of Schnoke's impairments regarding his residual function capacity, but rather simply makes conclusory statements that, based on his treatment of Schnoke, he is totally disabled. Therefore, while Judge Mehalchick previously found the ALJ's failure to even acknowledge Dr. Heinle's opinion was error under the new paradigm governing the analysis of treating source opinions, we cannot say that here, where the ALJ addressed the opinion and found it to be unpersuasive, there was more required. After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

II.    **Statement of Facts and of the Case**

A. **Background**

The administrative record of Schnoke's disability application reveals the following essential facts: In June of 2017, Schnoke protectively filed a Title II Application for a period of disability and disability insurance benefits alleging disability beginning April 2, 2016. (Tr. 110-111). According to Schnoke, he was completely disabled due to the combined effects of a series of physical and emotional impairments, including herniated disc, degenerative disc disease, arthritis of the neck, bone spurs, spasms, sleep apnea, left hip, hypersomnia, and depression. (Id.) Schnoke was born May 15, 1971, and was 46 years old at the time of the alleged onset of his disability, making him a younger worker under the Commissioner's regulations. (Tr. 110). He has a high school education and previously worked as a mail carrier and laborer. (Tr. 119).

B. **Clinical Record, Schnoke's Physical Impairments[1]**

With respect to Schnoke's physical impairments, the clinical record was aptly summarized by the ALJ, in the following terms:

---

[1] Since the plaintiff challenges only the ALJ's treatment of Dr. Heinle's opinion, which addressed his physical impairments, we do not summarize the record with regard to his mental impairments.

The record indicates that the claimant has a longstanding history of neck pain since 2004, with an acute exacerbation in 2012 (Exhibit 1F/78). Treatment notes from 2015 show a diagnosis of chronic pain syndrome (Exhibit 1F/99). Prior to his alleged onset date the claimant underwent cervical facet/medial branch injections, which provided good, but short-term relief (Exhibit 1F/101). He continued working part time at the post office until his alleged onset date on April 2, 2016 (Exhibit 7F/85).

Shortly thereafter, neurology treatment notes from April 13, 2016 show that claimant's gait was steady. Cranial nerves II though XII were intact. There were no sensory deficits. The impression was that the claimant had C5-C6 radiculopathy and good strength. Ongoing physical therapy was recommended (Exhibit 1F/80). Several months later, the claimant was seen by neurosurgery on August 3, 2016. Cranial nerves II through XII were grossly intact. Muscle strength was intact, equal, and 5/5. DTRs were present and equal; they were +2 in the upper and lower extremities. There was mild Hoffman on the right. He was positive for edema, erythema and warmth at the left elbow and tender to palpation. Sensation was intact. There were no gait disturbances. An MRI of the cervical spine from July 21, 2016 showed progress of disc disease at C5-C6 causing significant canal and foraminal narrowing. ACDF was recommended, but the claimant wanted to continue conservative management (Exhibit 1F/59, 61-62, 156).

The Pain Therapy Clinic recommended repeat right cervical RFA, which the claimant underwent on September 13, 2016 (Exhibit 1F/53,75). Orthopedic treatment notes from December 1, 2016 show that the claimant had good results. Upon examination, the claimant had mildly restricted range of motion in the cervical spine, primarily to right cervical rotation. Gait was symmetric and reciprocal. There was no loss of sensation noted. The claimant had normal bilateral upper extremity strength (Exhibit 1F/45). Three months later, the claimant underwent diagnostic imaging on December 19, 2016. A CT of the cervical spine showed straightening of the cervical spine, no significant canal stenosis, and moderate bony foraminal narrowing at C5-C6 bilaterally (Exhibit 1F/140). A bone scan showed focal radiotracer uptake at C5-

C6 related to degenerative disc disease. There was no evidence of spondylolysis. There was focal intense activity at the occiput of unclear etiology or significance. The region was only partially imaged on the concurrent CT of the cervical spine (Exhibit 1F/152).

Neurosurgery notes from December 28, 2016 show that the claimant preferred to continue pursuing nonoperative management. He noted that PT "helped significantly." The claimant was given a scrip for more outpatient PT (Exhibit 1F/39). The claimant attended therapy seven times by February 2017. Thereafter, however, physical therapy progress notes from May 3, 2017 show that he attended only five more times over the next several months (Exhibit 3F/32). Follow-up with the Pain Therapy Clinic on May 22, 2017 shows that the claimant had had good temporary pain relief of 75 percent of his neck pain lasting approximately six months with gradual return of symptoms. He felt that the duration of relief following RFA had begun to wane. He also felt that his relief was improved when he had injections that included both sides of the neck. The claimant continued physical therapy. He declined surgery because his radicular pain had improved. Upon examination, he had moderate pain with range of motion in the cervical spine. There was moderate palpable tenderness. There was negative Spurling's and was intact (Exhibit 1F/21).

The claimant underwent bilateral cervical medial branch blocks on June 7, 2017 (Exhibit 1F/17). A month later, he underwent Botox injections on July 6, 2017 to his cervical region (Exhibit 1F/4,11). Later that month, he underwent bilateral cervical MBB injections again on July 25, 2017 (Exhibit 1F/7).

The record shows that by July 5, 2017 the claimant had attended physical therapy 28 times (Exhibit 3F/68). Rehabilitation progress notes from July 27, 2017 indicate ongoing symptomatology, but some improvement with treatment (Exhibit 1F/4). Upon examination, the claimant had mildly restricted range of motion to C-spine. There was tenderness at cervical spinous processes in cervical region and in bilateral cervical paraspinal musculature and B upper trapezius and bilateral levator scapulae. Gait was slightly antalgic, favoring the left

lower extremity. No loss of sensation was noted. Motor bilateral upper extremity strength was normal and symmetric. No atrophy or tone abnormalities were noted (Exhibit 1F/6). The claimant began orthopedic treatment with a new provider on August 8, 2017. He reported left hip pain for the past year (Exhibit 7F/4). Based on the evaluation, the assessment was that the claimant had degenerative changes in his left hip that were significant enough to warrant consideration of total joint reconstruction surgery. The claimant indicated that he wanted to finish the treatment of his neck problems prior to considering total joint reconstruction surgery. He was advised to utilize anti-inflammatory medications in the interval. He asked about using a cane in the interval as well, which was recommended (Exhibit 7F/7).

Several weeks later, neurosurgery notes from August 31, 2017 show that the claimant had undergone supraspinous ligament injections, with moderate improvement in his pain. The injections provided short-term improvement and the muscle spasm discomfort was tolerable. His prior cervical radiculopathy had shown near complete resolution. The claimant had varying degrees of cervical degenerative disc disease, with moderate canal stenosis and mild to moderate foraminal stenosis bilaterally. He was to continue with conservative treatment, which had been improving his condition (Exhibit 7F/20-21).

Shortly thereafter, pain therapy notes from October 3, 2017 show that the claimant had received bilateral cervical facet block injections on July 25, 2017. He had had more than 60 to 70 percent of relief, but it had lasted only one month. The claimant noted that previous RFA had provided significant relief lasting six to seven months (Exhibit 7F/28).

Based on his previous success, the plan was for the claimant to return for a right cervical RFC, followed by left cervical RFA (Exhibit 7F/28). On October 31, 2017, he underwent right-sided radiofrequency rhizotomy of medial branches, dorsal ramus at superior and inferior aspect of C3-C4, C4-05, and C5-C6 under fluoroscopy (Exhibit 7F/51). On November 7,2017, he underwent left-sided radiofrequency rhizotomy of medial branches, dorsal ramus at superior and inferior

aspect of C3-C4, C4-05, and C5-C6 under fluoroscopy (Exhibit 7F/80). The claimant returned to orthopedics on February 13, 2018. He stated that since his last visit his pain had worsened. He was ambulating with a cane (Exhibit 7F/108). Upon examination, the claimant had an antalgic gait on the left. He had significant pain over the hip and thigh with active SLT. Passive SLR did not reveal any symptoms (Exhibit 7F/110). It was noted that the claimant was a surgical candidate, but that he was still smoking and he was advised to quit because of the increased risk of infection. He was given a referral to psychiatry for smoking cessation and anxiety (Exhibit 7F/111).

In the meantime, rehab notes from February 2018 show that the claimant had received Botox injections, which provided some relief for a few weeks (Exhibit 9F/44). The claimant also had follow-up at the Pain Therapy clinic on March 23, 2018. His right cervical RFA from October 31, 2017 had good effect lasting in the low lumbar region. His left cervical RFA from November 7, 2017 resulted in 90 percent pain reduction lasting approximately five months. The claimant rated his pain at about 5/10 daily and noted that it was waxing and waning in nature (Exhibit 7F/132). Repeat right cervical RFA followed by left cervical RFA was recommended (Exhibit 7F/133).

Monthly rehab notes between April and July 2018 repeatedly show that the claimant had relief from Botox injections for a few weeks (Exhibit 9F/44). During this time, he had orthopedic follow-up on June 25, 2018. He said that most days he was still having pain. He was taking two Aleve tablets in the morning and two tablets at night with some relief (Exhibit 7F/223). Upon examination, he had a severe limp. Clinical findings were otherwise generally unremarkable. Xrays showed severe bone on bone joint space narrowing. He was advised that he needed to quit smoking if he wanted to undergo hip surgery (Exhibit 7F/226).

Progress notes from August 27, 2018 were unchanged (Exhibit 7F/261,264). The following month, the claimant underwent diagnostic imaging of the cervical spine in September 2018. Xrays showed minimal retrolisthesis of C5 on C6. There was no significant vertebral body height loss. There was moderate-to-severe intervertebral disc

degeneration and uncovertebral osteoarthritis at C5-C6. No acute fracture or focal osseous lesion were identified. There was no prevertebral soft tissue swelling (Exhibit 9F/50-51). An MRI showed mild-to-moderate multilevel degenerative disc disease with loss of disc height and disc desiccation that was more notable at the C5-C6 disc level. Vertebral heights were overall preserved. There was no malalignment. At C5-C6, disc osteophyte complex impinged the cervical cord (Exhibit 9F/49).

The claimant saw Dr. Dirk Huntley Alander, an orthopedic surgeon, on October 17, 2018 to discuss the possibility of surgery. MRI findings were generally unchanged from 2016. There was degenerative disk C5-C6 level with some foraminal stenosis and osteopenic spondylosis. Dr. Alander indicated that he did not think that any type of surgical intervention for his neck was going to give him a reliable chance of getting rid of his pain (Exhibit 10F/1). Thereafter, in December 2018, the claimant saw his other orthopedist for his left hip (Exhibit 14F/208). Objective testing continued to show the claimant with a severe limp as he put less weight on his left side. The doctor again noted the claimant had severe degenerative disease and was a surgical candidate for hip replacement but he was still smoking despite being advised to stop (Exhibit 14F/211).

Records indicate the claimant did eventually cease smoking and surgery for his hip was tentatively scheduled for February 2019, but on his preoperative review it was noted the claimant had excoriations and pimples scratched open over his bilateral upper extremities, which was concerning enough for the doctor to postpone the surgery (Exhibit 14F/272). The claimant continued to have eschars on his forearms bilaterally and problems with his teeth so the surgery continued to be postponed (Exhibit 14F/299). In September 2019, the claimant met with dermatology in an effort to treat his excoriations/prurigo so he can eventually undergo his surgery (Exhibit 14F/409). Unfortunately, the claimant began smoking again during the pandemic and the orthopedist indicated that before the claimant could undergo his hip replacement surgery he would once again have to stop smoking, he would also need to make sure his eschars were healed and his oral surgery was complete

(Exhibit 14F/647). Diagnostic imaging continues to show that the claimant has left hip dysplasia and severe left hip secondary osteoarthritis (Exhibit 14F/658). At hearing the claimant testified that his left hip continues to cause pain and problems for him with walking, standing, driving and even sitting, however he indicated surgery is still being postponed because of his skin problems but he hopes to undergo the surgery in the near future.

Moving forward the records show that the claimant has continued with pain management in terms of his cervical pain. They have treated with thermal radiofrequency rhizotomy of medial branches, dorsal ramus at superior and inferior aspects of C3-C6 (Exhibit 14F/234). The ablation provided good pain relief of about 60-70% for about three months (Exhibit 14F/323). A few months later the claimant underwent ablation on the left side, as he has received good relief from same in the past (Exhibit 14F/348). In addition to his ablations, the claimant also received cervical facet injections in 2019 (Exhibit 14F/423). He reported some relief from same for a few days (Exhibit 14F/471). He also received epidural injections for which he had sustained pain relief for a few months (Exhibit 14F/540).

The claimant continued to follow with pain management, his primary care provider and neurology for targeted treatment (various injections) on his cervical spine, which would provide some pain relief (Exhibit 14F/548-549). In February 2021, treatment records continued to show the claimant to have mildly restricted range of motion in his vertical spine as well as tenderness but his bilateral upper extremity strength was still 5/5 (Exhibit 14F/552). By January 2022, the claimant reported that the various injections continued to provide pain relief of 60-70% for 5-6 weeks, during which time the claimant noted improved functional status and he is able to decrease the amount of pain medication taken during the time of relief (Exhibit 14F/629). At hearing, the claimant testified that he still regularly sees his doctors for injections and ablations (confirmed by treatment records), which do continue to provide some temporary relief but unfortunately nothing has been able to provide the claimant with sustained pain relief in terms of his cervical impairments. In sum, while the diagnostic testing and

some of the clinical findings do support limitations there are many clinical findings within the normal range. Therefore, the record does not require greater limitations than those provided for above.

(Tr. 1322-1326).

The ALJ also considered the October 2018 consultative examination records

of Dr. Choudry, noting:

> In addition to treatment records, in October 2018, the claimant underwent an orthopedic examination with Dr. Choudry. On examination, the doctor noted the claimant walked with a prominent limping gait and could not bear weight on his left leg nor could he squat. He was using a cane for assistance, which did make his gait steadier. The claimant's hand and finger dexterity were intact and grip strength was 5/5 bilaterally. At the time he had no cervical or paracervical pain or spasms. His joints were stable and nontender with no deformities, muscle strength was 5/5 and reflexes were normal. In his thoracic and lumbar spines he had no tenderness and straight leg raise testing was negative on the right side, however he was not able to raise his left leg past midline. There was evidence of significant atrophy in the left leg but his sensation was normal and strength was normal in all extremities but slightly reduced in the left leg to 4/5. The claimant was diagnosed with cervical radiculopathy with chronic pain and left hip osteoarthritis with atrophy and weakness of the left leg with impaired gait (Exhibit 11F/4-5).

(Tr. 1326).

Thus, with respect to Schnoke's physical impairments, the clinical record revealed that he experienced significant cervical spinal problems, difficulty with sustained pain relief, and walked with a cane due to arthritis in his left hip, but that he was treating his pain with conservatively, his pain often improved with injection

11

treatments and physical therapy, examinations showed many findings within normal range, and Schnoke displayed a range of physical abilities during a consultative examination.

### C. Schnoke's Self-Reported Activities of Daily Living

In addition to these clinical findings, Schnoke described difficulty with ambulation and activities of daily living, as well as difficulty focusing due to his mental impairments, pain, and fatigue. According to the ALJ:

> The claimant reported that due to his herniated disk in his neck, degenerative disc disease, bone spurs and continuous muscle spasms that in combination with his arthritis and chronic pain syndrome limit his ability to turn his head and causes continuous pain. He reported that if he stands, sits or walks too long he gets increased pain in his neck accompanied by headaches. He noted that he has arthritis in his left hip which has caused him to walk with a limp and use a cane (Exhibit 4E/2,9). The claimant testified that despite his on-going treatment he does not have much range of motion in his neck; he cannot turn his head left or right, he cannot look up or down and he cannot bend over without experiencing pain. He testified that his left hip has severe arthritis in it and has caused his left leg to be shorter than his right. He continues to require a cane to walk and try to keep balance but even with that he is still off balance at times. He testified that he cannot sit for a long time without pain shooting down his leg and can only stand for about ten to fifteen minutes before he has to sit down or lay down. Additionally, the claimant stated that due to his depression/anxiety in combination with his pain and fatigue he cannot focus on anything very long.

(Tr. 1322).

D. **The Expert Opinion Evidence**

Given this clinical picture, and Schnoke's self-reported activities of daily living, four medical experts opined on the severity of Schnoke's physical impairments, representing two extremes with regard to Schnoke's abilities.[2] Thus, the State agency consultant and consultative examiner's assessments found Schnoke capable of a range of exertional activities, despite his documented spine and hip impairments, while Schnoke's treating physicians opined that he was totally disabled.

With regard to the opinions that Schnoke was totally disabled by his physical impairments, treating physicians Dr. Heinle and Dr. Alander provided little explanation or nuance to their opinions and did not elucidate the specific capacities Schnoke retained with regard to his physical abilities. In a May 2018 treatment note, Schnoke's treating orthopedist, Dr. Heinle, opined that Schnoke, "remains unable to perform prior duties at this time and this began April 2, 2016. This is due to increased symptomatology from degenerative disc disease with intermittent radicular symptoms and decreased effectiveness of interventions including trigger point

---

[2] Two medical sources also opined on Schnoke's mental RFC. Since the plaintiff challenges only the ALJ's treatment of Dr. Heinle's opinion, which addressed his physical impairments, we do not address the mental RFC assessments.

injections and rhizotomies." (Tr. 1119). Dr. Heinle also submitted a letter explaining that he had been caring for Schnoke's musculoskeletal issues since 2015 and summarizing his conditions and treatment and symptom history before opining that "[h]e has been, and remains, totally disabled since 04/02/2016." (Tr. 1560). Although this opinion noted that Schnoke experienced decreasing relief from his chronic cervical spine pain and "could not return to work on 04/02/2016, even with restricted duty and time," documented worsening degeneration of his cervical discs and the difficulty in finding a long-term solution to his pain, and noted that he is awaiting a total hip replacement, Dr. Heinle did not opine as to Schnoke's specific functional abilities.

Treating orthopedic surgeon, Dr. Dirk Alander, who Schnoke visited twice to review his surgical options, also opined in a treatment note from October 17, 2018:

> At this point, I do not know that any type of surgical intervention for his neck is going to give him a reliable chance of getting rid of his pain. I think any operative intervention on the spine would be fraught with less than desired outcome.

> At this point, I believe he remains totally disabled from any type of intervention. I would agree with Dr. Heinle's assessment of his difficulties. He also has additional contributing factors of severe osteoarthritis of the hip which is also going to limit him quite severely. I do not believe he could perform any gainful work at this time.

(Tr. 1293). Thus, while Dr. Alander's opinion broadly supports the view of Dr. Heinle that Schnoke was unable to perform any work activity, it similarly is devoid of any meaningful explanation of his remaining RFC.

On the other hand, on October 12, 2017, State agency consultant Dr. Carl Ritner reviewed the medical evidence and opined that Schnoke could occasionally lift twenty pounds and could frequently lift ten pounds, could stand and/or walk for a total of two hours and could sit for a total of six hours in an eight-hour workday, was unlimited in his ability to push and /or pull except as noted for lift and/or carry, and could occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl. (Tr. 105). Dr. Ritner noted no manipulative, visual, communicative, or environmental limitations. (Id.)

Finally, following his consultative examination of Schnoke, Dr. Abaid Choudry opined as to his RFC on December 5, 2018. Dr. Choudry opined that Schnoke could frequently lift up to ten pounds, and could occasionally lift up to fifty pounds, could occasionally carry up to fifty pounds, could sit for four hours at a time and six hours total in an eight-hour workday could stand for one hour at a time and two hours total in an eight-hour workday, and could walk for thirty minutes at a time and one hour total in an eight-hour workday. (Tr. 1304). Based on his examination of Schnoke, Dr. Choudry also noted that Schnoke's cane was medically necessary

and he could only walk about half a block, unsteadily, without its use. (Id.) Dr. Choudry opined that Schnoke could frequently reach, handle, finger, feel push/pull with both hands and could frequently operate foot controls with both feet. (Tr. 1305). He also noted that Schnoke could occasionally climb stairs and ramps but could never climb ladders or scaffolds, balance, kneel, crouch, or crawl.[3] Dr. Choudry opined that Schnoke could frequently be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes, extreme cold and heat, and vibrations but could only occasionally operate a motor vehicle. (Tr. 1307). Although he did not believe Schnoke could walk a block at a reasonable pace on rough or uneven surfaces or climb a few steps at a reasonable pace with the use of a single handrail, in Dr. Choudry's view, Schnoke was capable of performing other activities of daily living like shopping, traveling, preparing meals, and personal hygiene. (Tr. 1308).

### E. **The ALJ Decision**

It was against this medical backdrop that a second disability hearing was conducted in Schnoke's case on September 7, 2022, at which Schnoke and a

---

[3] Dr. Choudry checked both "never" and "occasionally" with regard to Schnoke's ability to stoop.

vocational expert testified. (Tr. 1339-1358). Following the hearing, on October 13, 2022, the ALJ issued a partially favorable decision in Schnoke's case. (Tr. 1313-1338). In that decision, the ALJ first concluded that Schnoke met the insured requirements of the Act through March 31, 2020, and had not engaged in substantial gainful activity since April 2, 2016, the alleged onset date. (Tr. 1319). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Schnoke had the following severe impairments: degenerative disc disease of the cervical spine, degenerative joint disease of the left hip, chronic pain syndrome, and depression. (Id.)

At Step 3, the ALJ determined that Schnoke did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 1319-21). Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Schnoke's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that since April 2, 2016, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he could only occasionally perform overhead reaching with the bilateral upper extremities. He would require a cane for ambulation. He could occasionally balance and stoop. He could not kneel, crouch, or crawl. He could not use any ladders, ropes, or scaffolds. In addition, he would be limited to simple and routine work generally described as unskilled.

(Tr. 1321).

In fashioning this RFC, the ALJ considered the medical evidence and Schnoke's testimony regarding his impairments. The ALJ first engaged in a two-step process to evaluate Schnoke's alleged symptoms, finding that, although the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, Schnoke's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 1322).

In making this determination, the ALJ considered Schnoke's statements and testimony regarding his impairments and limitations, but contrasted these statements against the medical records, medical opinion evidence, and Schnoke's self-described activities of daily living, all of which suggested that Schnoke retained a capacity for sedentary work. (Tr. 1321-29).

Finally, in fashioning the RFC, the ALJ considered the medical opinions and prior administrative medical findings. On this score, the ALJ found that neither the liberal opinions of Drs. Ritner and Choudry, finding Schnoke capable of a range of exertional activities, nor the conservative opinions of treating physicians Drs. Heinle and Alander, precisely reflected the overall evidence with regard to the limiting effects of Schnoke's impairments.

On this score, the ALJ did not find the opinion of Dr. Ritner to be persuasive because it was not consistent with the overall evidence dated after he rendered his opinion, which showed worsening pain in the left lower extremity and the need to carry a cane, nor did it consider the continued pain management undergone by Schnoke in terms of his cervical pain. (Tr. 1327).

The ALJ found the opinion of consultative examiner Dr. Choudry somewhat persuasive because, although Dr. Choudry did not identify the particular medical or clinical findings that supported his assessment, it was generally consistent with the results of his examination. (Tr. 1328). Nonetheless, the ALJ found the balance of the medical record, including Schnoke's testimony about pain and limitations and the objective medical evidence, indicated a greater degree of limitation in terms of Schnoke's exertional capabilities as well as in his range of motion. (Id.)

The ALJ also addressed the opinions of treating physicians Dr. Heinle and Dr. Alander, finding them both unpersuasive. With regard to the opinion of Dr. Heinle, the ALJ explained:

> First in terms of the claimant's inability to perform "prior duties", it is unclear what the doctor actually meant by this statement as there is nothing else in the doctor's records defining prior duties (Exhibits 8F and 14F). Moreover, at hearing the undersigned asked the claimant what his doctor meant by that and the claimant proceeded to testify that he believed it mainly dealt with duties he could perform around the house. The claimant testified the doctor told him he could try and do

whatever he could around the house but if it cause pain then he should stop. Despite there being no clear meaning to what Dr. Heinle was addressing, the undersigned still gave the claimant all benefit of the doubt and concluded the claimant could not perform his past relevant work, if in fact that is what Dr. Heinle was referring to. That said, consistent with the medical evidence and objective findings the claimant would be capable of sedentary work. Additionally, the doctor further stated the claimant was totally disabled. This is unpersuasive as it is a statement that goes directly to a topic reserved for the commissioner.

(Tr. 1328). The ALJ similarly found Dr. Alander's statement that Schnoke could not perform any gainful activity unpersuasive since he did not provide any specific or functional limitations suffered by the plaintiff and was an opinion on a topic reserved for the commissioner as it stated he was "totally disabled." (Id.)

Having arrived at this RFC assessment, the ALJ concluded that, since April 2, 2016, Schnoke had been unable to perform any past relevant work. (Tr. 1329). The ALJ went on to conclude that, on May 14, 2021, Schnoke's age category changed from a younger individual to an individual closely approaching advanced age. (Id.) Thus, although the ALJ concluded that prior to May 14, 2021, considering Schnoke's age, education, work experience and RFC, there were jobs that existed in the significant numbers in the national economy that Schnoke could perform, the ALJ concluded that Schnoke was disabled as of May 14, 2021 when his age category

20

changed. (Tr. 1331). Based upon these findings, the ALJ issued a partially favorable decision. (Id.)

This appeal followed. (Doc. 1). On appeal, Schnoke argues only that the ALJ again failed to properly evaluate the opinion of treating physician Dr. Heinle. However, finding that the ALJ has now addressed the cursory opinion of Dr. Heinle, for the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   **Discussion**

### A.   **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence.

23

Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal

26

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic

view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

28

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

As previously mentioned, the plaintiff filed this disability application after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions

changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant

the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

Judicial review of this aspect of ALJ decision-making is still guided by several

settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." Chandler

v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence

31

for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

It is against this backdrop that we evaluate the decision of the ALJ in this case.

### E.     The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Schnoke retained the residual functional capacity to perform sedentary, simple, and routine with the additional articulated limitations. Therefore, we will affirm this decision.

In this single-issue case involving the ALJ's rejection of a treating source opinion, we do not write upon a blank slate. Indeed, our review of Schnoke's appeal is informed not only by the record of the administrative proceedings, but also the proceedings before this Court. In fact, this Court previously remanded this case on this precise issue, finding that the ALJ's failure to adequately address the opinion of treating orthopedist Dr. Heinle was error.

Our review of this issue is also cabined by the Social Security regulations' evolving standards regarding the evaluation of medical opinion evidence. As we have noted, after the paradigm shift in in the manner in which medical opinions are evaluated when assessing Social Security claims, "[t]he two 'most important factors

for determining the persuasiveness of medical opinions are consistency and supportability,' [ ] [and] [a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." Andrew G. v. Comm'r of Soc. Sec. at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2)). But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight. Moreover, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009). Thus, our inquiry is not whether evidence existed from which the ALJ could have drawn a contrary conclusion, but rather whether substantial evidence existed in the record to support the ALJ's decision to credit or discredit each medical opinion, and whether the ALJ appropriately articulated his decision under the regulations.

Our analysis is further constrained in this case by the fact that the treating physician's opinion at issue includes no RFC assessment and concludes only that the claimant "has been, and remains, totally disabled since 04/02/2016," (Tr. 1560), leaving the ALJ with little substance to analyze in the decision.

34

This Court previously rejected the Commissioner's argument that the ALJ was not required to analyze Dr. Heinle's opinion at all because it was a conclusion on an issue reserved for the Commissioner. Judge Mehalchick explained:

> The ALJ fails to mention Dr. Heinle's opinion in his decision. (Doc. 18-2, at 16-29). The opinion of Dr. Heinle comes from an acceptable medical source as he is a licensed physician. 20 C.F.R. §§ 404.1502(a)(1), 416.902(a)(1); (Doc. 18-7, at 5). Although Dr. Heinle "[is] not entitled to any deference given [his] status as [a] 'treating physician[n]'" the ALJ failed to adequately address his opinion. <u>See Duhl v. Kijakazi</u>, No. 20-1123, 2021 WL 5909819, at *3 (W.D. Pa. Dec. 14, 2021); (Doc. 18-2, at 21-27).
>
> Under the new regulations, a statement from a physician that the claimant is disabled does not require analysis by the ALJ, as such a determination is reserved for the ALJ. 20 C.F.R. §§ 404.1520b(c), 416.920b(c).
>
>> Paragraphs (c)(1) through (c)(3) apply in claims filed (see § 404.614) on or after March 27, 2017. Because the evidence listed in paragraphs (c)(1) through (c)(3) of this section is inherently neither valuable nor persuasive to the issue of whether you are disabled or blind under the Act, we will not provide any analysis about how we considered such evidence in our determination or decision, even under §[§] 404.1520c[, 416.920c]:
>>
>>  . . .
>>
>> Statements on issues reserved to the Commissioner. The statements listed in paragraphs (c)(3)(i) through (c)(3)(viii) of this section would direct our determination or decision that you are or are not disabled or blind within the meaning of the Act, but we are responsible for making the determination or decision about whether you are disabled or blind:

> (i) Statements that you are or are not disabled, blind, able
> to work, or able to perform regular or continuing work.

20 C.F.R. § 404.1520b(c); *see also* 20 C.F.R. § 416.920b(c).

Dr. Heinle's opinion that Schnoke "remains unable to perform prior duties at this time and this began April 2, 2016[,]" does not appear to be a statement solely regarding Schnoke's ability to work. (Doc. 18-19, at 8). The opinion lends itself to a general ability for Schnoke to perform all "prior duties" not necessarily prior duties at his employment. (Doc. 18-19, at 8); 20 C.F.R. §§ 404.1520b(c), 416.920b(c). Even if Dr. Heinle's opinion is considered a statement regarding Schnoke's ability to work, his opinion was comprised of more than just a disability statement and required some assessment by the ALJ. Cf. Michelle K. v. Comm'r Of Soc. Sec*.*, 527 F. Supp. 3d 476, 484 (W.D.N.Y. 2021) (finding that the ALJ did not err in his assessment of a treating physician's opinion that the claimant "was no longer able to work due to pain" when the ALJ explained that the opinion was not persuasive because it provided little explanation and medical documentation); (Doc. 18-19, at 4-9).

Dr. Heinle explained that Schnoke has "increased symptomatology from degenerative disc disease with intermittent radicular symptom and decreased effectiveness of interventions including trigger points injections and rhizotomies" and noted that Schnoke experiences cervical pain. (Doc. 18-19, at 8). Thus, Dr. Heinle provided medical evidence other than his statement that may have been reserved for the ALJ. (Doc. 18-19, at 8). The ALJ is only required to address the supportability and consistency of Dr. Heinle's medical opinion, however he has failed to do so in any capacity. (Doc. 18-2, at 21-27); Densberger, 2021 WL 1172982, at *8 (citing Andrew G*.*, 2020 WL 5848776, at *5); 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). 20 C.F.R. § 404.1520c(b)(2) states that the ALJ "will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinion[n] or prior administrative medical findin[g]." See also 20 C.F.R. § 416.920c(b)(2). The factor of supportability is

considered through the lens that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).The factor of consistency is determined through "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 416.920c(c)(2), 404.1520c(c)(2). *The ALJ fails to mention Dr. Heinle's opinion anywhere in his decision.* (Doc. 18-2, at 16-29). Thus, he has not demonstrated why Dr. Heinle's opinion regarding Schnoke's degenerative disc disease and pain was unsupported or inconsistent. *See* 20 C.F.R. §§ 404.1520b(c), 416.920b(c). As such, the Court finds that the ALJ's failure to consider the opinion of Dr. Heinle is not supported by substantial evidence. <u>See</u> <u>Densberger</u>, 2021 WL 1172982, at *8 ("An ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion.").

(Tr. 1403-1405) (emphasis added).

Thus, in the context of the ALJ's previous decision which failed to even mention the opinion of Dr. Heinle, the Court held that "some assessment" was required by the ALJ because Dr. Heinle's statement that Schnoke was unable to perform prior duties could have related to more than just his ability to work and because he provided medical evidence other than this statement that may have been reserved for the ALJ. But the Court also acknowledged that, although some explanation was required, an ALJ's rejection of a medical opinion that provided little

explanation and medical documentation was not error. (Tr. 1404 (citing <u>Michelle K.</u>

<u>v. Comm'r of Soc. Sec.</u>, 527 F. Supp. 3d 476, 484 (W.D.N.Y. 2021)).

On remand, the ALJ explicitly addressed the opinion of Dr. Heinle but still

found it to be not persuasive. The ALJ explained:

> Dr. Heinle, the claimant's treating physiatrist treatment records note as
> of May 2018, the claimant "remained unable to perform prior duties at
> this time and this began in April of 2016. This is due to increased
> symptomatology from degenerative disc disease with intermittent
> radicular symptoms and decreased effectiveness of interventions"
> (Exhibit 8F/137). He further noted he would author a note regarding his
> total disability (Exhibit 8F/138). The doctor then submitted a letter in
> May of 2018. The doctor reported the claimant had been and remined
> totally disabled since April 2, 2016 (Exhibit 13F). The undersigned has
> considered the doctors statements herein but does not find them
> persuasive. First in terms of the claimant's inability to perform "prior
> duties", it is unclear what the doctor actually meant by this statement
> as there is nothing else in the doctor's records defining prior duties
> (Exhibits 8F and 14F). Moreover, at hearing the undersigned asked the
> claimant what his doctor meant by that and the claimant proceeded to
> testify that he believed it mainly dealt with duties he could perform
> around the house. The claimant testified the doctor told him he could
> try and do whatever he could around the house but if it cause pain then
> he should stop. Despite there being no clear meaning to what Dr. Heinle
> was addressing, the undersigned still gave the claimant all benefit of
> the doubt and concluded the claimant could not perform his past
> relevant work, if in fact that is what Dr. Heinle was referring to. That
> said, consistent with the medical evidence and objective findings the
> claimant would be capable of sedentary work. Additionally, the doctor
> further stated the claimant was totally disabled. This is unpersuasive as
> it is a statement that goes directly to a topic reserved for the
> commissioner.

(Tr. 1328). In our view, given the meager nature of Dr. Heinle's opinion which was inadequately defined with regard to Schnoke's functional limitations, while the ALJ's analysis of the opinion is succinct, we cannot see what more the ALJ could have done to analyze this opinion given the complete lack of specifics with regard to Schnoke's abilities. In fact, as this court has explained in the past, "a lack of explanation by the source is a proper basis to discount a source's opinion." Bodley v. Saul, No. 4:20-CV-267, 2021 WL 199354, at *11 (M.D. Pa. Jan. 20, 2021).

Moreover, although the ALJ found the opinion to be not persuasive with regard to the statement that he is totally disabled, the ALJ did credit Dr. Heinle's opinion that he was unable to perform his prior duties by concluding he was unable to perform any past work. However, as the ALJ explained, the other evidence in the record, including the opinions of two medical experts, supported the conclusion that Schnoke was at least capable of a limited range of sedentary work with the use of a cane. This determination is consistent with the consultative examination findings and other medical evidence showing that Schnoke experienced chronic cervical spine pain, and limitations in his left hip functionality, but that his pain could be treated successfully with injections, and he retained the ability to perform a range of activities with the use of a cane. Moreover, to the extent that the plaintiff argues Dr. Heinle's opinion finds support in the similarly sparse and conclusory opinion of Dr.

39

Alander, the ALJ similarly found Dr. Alander's statement that Schnoke could not perform any gainful activity unpersuasive since he did not provide any specific or functional limitations suffered by the plaintiff and was an opinion on a topic reserved for the commissioner as it stated he was totally disabled.

In sum, although some explanation is needed where an ALJ rejects the opinions of treating source physicians, the ALJ's analysis can only be as detailed as the opinion itself. Moreover, the ALJ cogently and fairly assessed the medical evidence of record in fashioning a fairly restrictive RFC that reflects Schnoke's difficulties with chronic cervical spine pain and his left hip impairment requiring the use of a cane and adopted Dr. Heinle's opinion that Schnoke was incapable of performing his past work. In fact, this RFC resulted in a partially favorable determination for the plaintiff, finding that he was disabled beginning on May 14, 2021. On these facts, and constrained by the limited scope of our review and the administrative backdrop upon which this case is cast, we cannot say more is needed here.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way

which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.  <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: June 18, 2024